Good morning. May it please the court, Daniel Tenney for the United States. I'd like to reserve three minutes for rebuttal if I could. I'll try to help. Thank you, Your Honor. This case involves three different provisions, all of which interfere with the federal government's enforcement of immigration law. I'd like to start with SB 54, which is the provision about transferring aliens from state or local custody to federal custody. To understand why that provision is preempted, you have to understand the way Congress set up the scheme of the interaction between state and local custody of aliens and federal custody. Congress provided that in circumstances where there's an alien who would be subject to either discretionary or mandatory detention by the United States under the immigration laws, that detention would not begin until the completion of a period of incarceration in state or local custody. And that's set out in Section 1226 of 8 U.S.C. 1226 in the case of most aliens, 1231 in the case of aliens with a final removal order. And in some circumstances, like in 1226C, detention by federal officials is mandatory, but it's supposed to begin when the alien is released from state or local custody. And so the issue here is that California has enacted a statute that says that at the termination of state or local custody, California is not going to turn over custody, even in circumstances where Congress has directed federal officials to take custody. California's localities are barred from transferring aliens from state or local custody. Sotomayor, they're barred from affirmatively helping you take custody. There's nothing in this statute that allows them to prevent you from taking custody, is there? Well, what it says is that yes or no. Is there anything in the statute that says to local officials you may prevent the Federal Government from taking custody? It doesn't use the word prevent, Your Honor. What it says is — Is there any word, anything in this statute that authorizes them to interfere in your efforts to take custody? What it says is they can't transfer custody, Your Honor. So they can't. What the statute says is you local officials who are being paid by the State are not being paid to help enforce immigration laws. So as part of your duties, you can't transfer custody. You can't take somebody in your custody and turn them over to the feds. But there's nothing in this statute that says you will interfere in any way in the feds exercising their activities, correct? Well, it depends what you mean by interfere, Your Honor. We would submit that — Well, you want their help. Are they entitled not to give you their help? Well, let me be clear about what we mean by wanting their help. If it weren't for the fact that Congress had provided that State and local authorities can complete the period of detention, then these people would be subject to Federal custody immediately. And they're subject to your Federal custody immediately upon the end of their period of State detention. My question is, are you entitled to the aid of the State Government in enforcing the immigration laws? And if so, tell me where that is in statute or in the Constitution. Well, I guess there's a constitutional and a statutory component, and it would clarify things to separate them, Your Honor. For Tenth Amendment purposes, which I understand is the constitutional component of the question, if Congress had — their Tenth Amendment argument has to be that even if Congress had explicitly and directly enacted this provision, it would be unconstitutional. That would be the constitutional limit. So they would say, if Congress said States can maintain custody over aliens who would otherwise be subject to Federal custody, but they may do so only if they agree at the end of that custody to transfer custody to the Federal Government and to let the Federal Government know that the person is about to be released and to transfer custody, their position would have to be, if they're saying this is a Tenth Amendment violation, would have to be, that's unconstitutional. And we know from cases — I'm not sure why that would have to be so, because the scenario you just outlined gave the State a choice, said you — we could take custody of this guy right away. We're the Feds. You want to take custody of him first, please agree with us that you'll hand him over second. That's perfectly — I'm not sure why there's anything wrong with that. That's not the system that we now have, is it? Well, I mean, the thing that complicates matters is that nobody thinks that the States are just going to stop enforcing their criminal laws, so it's not a choice in a practical sense. But the point is that we're not talking about a circumstance where the States say, we don't want to regulate these people, we want to leave them alone, we want to have nothing to do with it, the Federal Government is coming in and telling us that we have to. Let's change the scenario a little bit. Let's just say hypothetically that SB 51 goes away. But they're just an agreement, a quiet agreement that the State people, because they're concerned about some very legitimate issues about people wanting to — who were in custody cooperating as witnesses, or they're worried about families, or basically local law enforcement. But there's no statute that requires that. They just don't want to cooperate anymore. Would that be a violation of Federal law? And if so, what law? Well, Your Honor, it's hard to answer that without knowing the particulars of how they would set that up. I mean, the point is — Let's just say that they voluntarily did exactly what SB 54 requires. Well, Your Honor — But there's no law. In an individual case, we're not saying that there's a Federal statute that they would be violating, but this is a preemption case — Say the whole thing. But say it was a police union thing. I'm not trying to shift any blame on them. But just say they just said, you know, we're not going to cooperate with this anymore. I mean — There's no law. What Federal statute would be violated if that happened? Well, we're not saying that a Federal statute is violated, Your Honor. What we're saying is that the State has enacted a statute that is an obstacle to the enforcement of Federal law. And so it — Well, it may be, but I mean, the reality is that it's clear that that's what was intended to be an obstacle, but it doesn't — because it's an obstacle doesn't mean it's illegal, right? Your Honor, the way preempt — the preemption argument that we're raising is not an express preemption that says there — you can't comply with both at the same time. They would be directing State officials to do something illegal. But we know that obstacle preemption goes further than that. And obstacle preemption says if a State enacts a statute that is an obstacle to the enforcement of Federal law — and this clearly is. And just to turn — I talked about the Tenth Amendment point, I think, but I want to just focus on the obstacle preemption point now. In your answer, let's be sure you get the Tenth Amendment in there, because you've got this anti-commandeering aspect of the Tenth Amendment. I gather you're not claiming that if the Congress said that the State of California must assist Federal enforcement of the transfer of all these people, it must do it, that that would somehow survive Tenth Amendment scrutiny. It wouldn't, would it? It — I mean, you use the word assist, Your Honor. If Congress said — and this was a If you want to keep enforcing your criminal laws against these aliens in whom the Federal government also has an interest, you can continue to do so, but you have to do so under certain conditions. And those conditions include that at the end of custody, custody will be transferred to Federal officials. Perhaps that could be done. But the reality is that having the local laws apply for — sometimes there's the predicate for removing people from the country because they have been convicted. So let's take the current situation here. What I'm not seeing is any violation of Federal law by the State of California saying to its law enforcement people, you must cooperate in the handover. Now, is it a surprise to the government, the Federal government? No doubt. Is it inconvenient? No doubt. Did it cause perhaps some real disruption? No doubt. But is it illegal? That's what I'm struggling with. It's not a policy issue. Is it illegal? And I don't see that your point is correct, that you have any kind of intergovernmental immunity or anything else that would protect you in that setting. What am I missing? Well, Your Honor, that turns to the second piece of what I outlined earlier. I started with the Tenth Amendment. I'd like to now turn to the preemption. So the question now, it's a question of whether it's an obstacle to the scheme that Congress set up. And so when Congress set up a scheme and what Congress said was, at the end of this period of State custody or local custody, Federal officials, in some circumstances may, in other circumstances shall, take custody when the alien is released. And the question is — Nobody's barring that. And the question is, did Congress intend — what they meant by that would be that States would be free to say, okay, you're under — you're legally permitted to take custody, but you better get to the courthouse fast — you better get to the local police station fast, and you better be ready to grab the person as soon as they walk out the door, and you better have five agents there ready because we're not going to turn them over. And would it have — would Congress have thought that this was an obstacle to what they were doing if States were setting it up that way? God knows what Congress would have thought. I mean, that's — that's a strange argument you're making because we — Congress doesn't think. They pass — they collectively pass bills. Congress doesn't think. My question is really the same one Judge Smith was trying to ask you. If there is no affirmative obligation to help, is the failure to help an obstacle? Well, especially, getting to my colleague's point, if Congress has not expressly said that that's what they intend. See, if Congress had passed an act that says what you're saying, please help us. When — when — when the time is up for any local detention, you must notify the local folks and notify the INS or — and — or DHS and help them. We'd have a Tenth Amendment issue, and it might be a close one. But they haven't. So your argument is it's an obstacle because if they — if they were more helpful, we'd be able to do our job better. But they're not required to be helpful, are they? Well, just in terms of the absence of an express preemption provision, the Supreme Court said in Crosby that the absence of an express preemption provision may just reflect that Congress presumed that obstacle preemption principles would ordinarily apply. But here, there's a very good explanation for why there's no express preemption provision. It would not have occurred to Congress that a State would say, oh, we understand we're taking these people into custody. The Federal government is directed in some circumstances to take custody upon the release from — from custody, but — but we're going to block that. We're going to say we're not going to tell you — Well, they're not — see, if they were blocking it, if it said you will prevent the Federal government from taking custody, I — you'd have a slam-dunk case. We wouldn't be here. The question is whether they must affirmatively assist you in taking custody. Isn't there a distinction between the two? I'm — I'm not sure allowing a transfer, a peaceable transfer at the termination of custody, the State doesn't have to change what — what time, what date it's releasing people, doesn't have to, you know — all we're doing is saying, is it an obstacle to the — to the enforcement of Federal law if instead of, at the time that the State chose for its own reasons to release an alien, if instead of going into the prison, having a peaceable transfer that doesn't endanger the community, the alien, the Federal officers, or any State local officers who might be involved, is it an obstacle that instead of doing that, what the State says is, Federal government, try to figure out when this person's going to be released and then try to run them down? Well, I — It just seems to me Congress's option then is to say, well, if you're not going to cooperate in the way that we find most helpful, we're just going to come and get these people right now, right? We don't have to wait. We've tried to be nice and allow you to run your criminal justice system the way you want, but if you're not going to cooperate and cause the problems that you just described, then I think what I heard you say is that Congress can just say, well, forget it. We'll just come and get them right now, and they — we'll take them and remove them before they've even served their sentence. And so why isn't that the solution to the problem that you're posing? I mean, that's not the way Congress set it up, Your Honor. The Congress, out of deference to states, let states run their system. It's not the assumption that states would be cooperative. And if Congress finds that they're not, then it doesn't seem to me Congress can command the states to go — to take affirmative steps to assist. Congress can just say, we're not going to defer to you anymore. But until they do that — until they do that, where's the violation of federal law in their failing to cooperate? You can't command them to do this without violating the Tenth Amendment, can you? Well, Your Honor, I guess it seems strange to say that federal principles — federalism principles would say that by — by enacting a scheme in which the states get to go first, get to enforce the criminal laws, that somehow that's more intrusive than if Congress had said, well, we're just not going to let you enforce your criminal laws at all. But you're kind of dancing around the issue with respect. I mean, the senators from the various states and so on, they all weighed in on what they wanted to do with that. But the fact is Congress — it can change it in terms of who gets to people first, as my colleague has indicated. But they haven't done that. In this case, I think it's pretty clear that without the voluntary cooperation of the states, they could not, just because they're frustrating a federal law, command that all Isn't that correct? I guess the point here is that we'll — I mean, the problem with these hypotheticals is that we have — It's not a hypothetical. Well, no. I'm sorry. The reason I'm struggling with the idea of you would just say the state criminal laws don't apply or they don't get to enforce, it's just so — the hypothetical option that would be presented there is so distant from what anybody expected would happen that — And I take your point, that Congress passed these statutes on the assumption that at the end of the state detention, there would be some cooperation. But is that — that assumption is not part of the law, is it? See, what you're really saying to us is they set it up this way assuming the states would be cooperative. Well — But they didn't say that. And so my question is, is it really an obstacle to enforcement of the immigration laws that Congress made an incorrect assumption? Well, I mean, if the question of it's frustrating the operation of the immigration laws, Congress directed Federal officials to take custody of people upon their release from State custody. And it certainly is an obstacle to that if they have to do it in this — in this much more difficult and dangerous way. So that — Why don't you start — didn't you go back to Judge Smith's question? Well, but — but so that — so that should take care of the — It's an — it's an obstacle in the sense that it makes their job harder. But that's not what obstacle preemption is about. Not everything that makes the job of the Federal government harder leads to obstacle preemption. Don't you have to have some duty on the one hand not to interfere? And see, that's — that's why I'm having — Well, I mean, this is why I tried to separate out the constitutional and the — and the statutory question. If — if there's a State enactment that makes it more difficult for the Federal government to enforce Federal law, that is an obstacle. That's almost the definition of obstacle preemption. So then the — It may be an obstacle in a practical sense, but legally, how is it — how does it qualify here? The Congress has not specifically said, we're doing this because we — basically, the condition precedent of this is — the predicate, rather, is that all States will cooperate in turning over these people at the end of the time. They didn't say that. But what you do is you have California deciding, for its own policy reasons, that this is contrary to the interests of its public policy. It does not want to be part of it. It feels it's a wrong thing to do. Now, you can say, well, that's — they shouldn't have done that. But they did. They're entitled to, under the governmental structure of the State of California. And you're saying, boy, this is really bad. It's really frustrating. We'll get you that. We'll grant you that. We're just struggling with the fact that — is it illegal? I don't see where it's illegal. Well, Your Honor, I don't — I think there it's really — if you're just talking about the difference between an express preemption provision, which would say it's illegal, you can't do it, or obstacle preemption, which presumes that Congress didn't directly speak and say States must do this or must not do that, I don't want to sit down without addressing the other two provisions. I'm happy to take more questions about this. I see my time is — I'm already into my rebuttal time. But I do want to talk about the other two. I don't want to stop discussion on SB-54. So the other two provisions, those are provisions that single out particular — the federal government, particularly in particular activities that the federal government uniquely engages in and creates a special set of rules for them. So the first one I'll talk about is the employment provision, with the Court's permission, where what they say is if there is a federal immigration inspection of records, not under any other circumstances, then there's a requirement that you provide notice to employees backed by civil penalties if you don't. Sotomayor, I have a very specific question on that. Is there any federal law or regulation which makes the fact of the inspection confidential? No, Your Honor. So if they were not ordered to by State law, all employers would be free to disclose this information? That's correct, Your Honor. So you're not making an obstacle argument? Yes, we are, Your Honor. And I'll explain the obstacle preemption in two different ways. First of all, to go — which goes more directly to your question, in some circumstances, even though the employer would be free to, it might — it might suit both the employer and the federal government if the employer didn't. I'll give a simple example. Suppose the inspector's team — But you couldn't compel him to. You couldn't compel — in other words, in no — there's no compulsion on the employer not to tell people about this. There is — you said you couldn't. We — Congress hasn't. Congress could, but Congress hasn't. Right, right. Under existing law, you can't. Right. Under existing law, you, the executive branch of the federal government, cannot compel somebody to do that. Correct, Your Honor. But, again, that's just — all that proves is that it's not physically impossible to comply with both statutes at the same time, which is not — which is — which would get one form of conflict preemption but wouldn't get to what we're talking about. But just to give an example — But you're arguing the discrimination. See, I understand your discrimination argument. Put it aside for a second. I'm having trouble understanding your obstacle argument here. Well, let me explain that in two ways, Your Honor, if I might, and I apologize for the time. First, with respect to circumstances in which there would actually would be a conflict in policy, suppose — and I don't think this is a far-fetched hypothetical — suppose there's an employee. Most employees, you know, submit their documentation in good faith. Sometimes there's errors, and employers come in and correct it. And — but suppose there is an employee, and the federal officials come in, and they say, we've got — we've discovered that this document doesn't look right. It doesn't seem right to us. The employer looks at it and says, you know what? This person was lying to me. You know, this is a false document. It's not that the person in good faith — I just think that this person was misleading me, lying to me. But state law specifically exempts that, does it not? The employer is not penalized for not saying anything to an employer whether it's a fraud involved. What the state law exempts is if the federal officials specifically direct the employer not to tell the person. But that's not what I'm talking about here. What I'm talking about here is the employer discovers on his or her own, oh, this looks false. And so they might say, oh, you know, I don't think this person is on the level. And state law says, go tell them that the federal government has found out about this. That's what state law says. Federal law doesn't — But it gives the federal government the option to get out of the state law by saying to the employer, don't tell the employer. If the federal government knows. But if it's information that the employer knows that the federal government doesn't, the federal government just says, this document looks wrong to us. Please figure out. The employer would have better knowledge than the federal government about whether this is an error or whether this is fraud. And if it's fraud, maybe it's not a great idea to tell the person who committed fraud, by the way, the federal government just found out. That's one species of obstacle preemption. Let me do this. We've asked you a lot of questions. This is an important case. Why don't you sit down for a minute? We'll give you two minutes of rebuttal after they finish their argument, OK? And then you can come back and give us more information. OK. OK, Your Honor. I do want to finish this and also talk about the other provision, which I have discussed at all. You're going to choose. You want your two minutes or you want to do this? Well, I guess if Your Honor wants me to sit down, I'll sit down. No, no. We want you to have your two minutes. If you want them now, you can have them. If you want them later, you can have it then. I suggest you do the later. All right. I'll do it later. OK, all right. You could tell he disagrees with you. May it please the court, there is no aspect of the Federal Immigration and Nationality Act that compels the state of California or its officials to assist with immigration enforcement. To the contrary, the INA assigns the task of immigration enforcement to federal officials and it recognizes that any state involvement in those matters is up to each state to decide for itself. There is no assumption that state and local officials will assist with that endeavor. The provisions in the INA that address state involvement make clear that it is up to each state to decide. It is purely voluntary. And it would be, in any event, Congress would lack the authority to compel the kind of assistance that the United States needs. I'm not sure you need to go there. Are you sure Congress would lack the authority? And is it necessary for us to decide that issue to rule in your favor? The Court doesn't need to decide that. That's a pretty broad statement you're making, and I'm not sure what the limits of Congress's authority are in this area. Isn't it enough that it hasn't exercised them yet? Isn't it enough, I'm sorry? Isn't it enough that Congress hasn't tried to exercise authority in that area? Absolutely, it's enough. This case... Let me ask you, because your friend didn't get to talk about 103, and maybe we can help shape the discussion that he wants to make about 103 by asking you some questions about it. As I understand it, the federal government doesn't oppose the notion that the Attorney General can inspect the conditions of confinement. That's what their brief says, because that's not discriminatory in the sense that the Attorney General does that for state and local prisons, too. I'm having difficulty understanding why the conditions of apprehension are any business of the state of California. The state of California has an interest in understanding whether, for example, state and local officials participated in an apprehension and transfer, and the state has a legitimate interest in understanding how federal officers conduct their activities in the state. Perhaps, for example, if federal officers apprehend individuals at schools or in front of state courthouses. To be sure, the state cannot dictate or control the manner in which a federal officer conducts his affairs. Can it compel the federal government to turn over records about how apprehensions were? I don't think it can, but I don't think that... That's what the statute seems to say. The records that are involved here are not federal in that sense. There certainly can be situations in which a detainee file could contain a federal document, but the focus of AB 103 inspections are on records of the facilities themselves. And I want to be really clear about the kinds of facilities that are subject to AB 103 reviews. Well, before you get to the facilities, because I'm really focusing on what the statute provides, then you can tell me about what facilities are subject to it. The statute talks about the attorney general making sure that detainees are afforded due process. Now, the report you filed deals with due process in the sense of having access in confinement to lawyers and visitors, but the statute seems much more broad. What... Can the attorney general investigate whether or not the proceedings in front of the IJ were fair? I think the attorney general would not have authority to do that, and that's not what it is doing. Well, it's not what he's doing, but my question is does the statute allow him to do that? It does not. Due process in AB 103 contemplates a review, as Your Honor noted, about conditions of confinement. Not conditions of... Not whether or not... See, because on the face of it, if I were trying to figure out whether a detainee got due process, one thing I'd look at is whether he had an early opportunity to appear before a neutral magistrate and things like that. That's... Those are certainly within the traditional notion of due process. So I'm trying to figure out what the limits of this due process thing are. The statute provides... Is focused on conditions of confinement. B1A talks about due process. B1B, which includes the language Your Honor is pointing to, the standard of care and due process provided is a specific subset of the kind of due process that's provided in B1A. We know that because... That second subset I'm not so much worried about. It's the broader subset. It's the broader one. What is... What are the limits of your authority to investigate whether or not detainees have been provided due process? The statute is focused on the conditions that apply. The... That is the authority... And insofar as they bear on detainee access to court, that is the authoritative interpretation of the state and the California Attorney General. And as reflected, as Your Honor pointed out in the AB 103 report, and I also think... When you say it's the authoritative interpretation of the state, you mean that's the way you interpret it? That's the way the state and the California Attorney General... When you say the state, who besides the California Attorney General? The California Attorney General. Okay. So, and you're the California Attorney General? I'm not. Yeah, but you're... I represent him here in this... So, it's the way you interpret it, right? The Attorney General is vested with authority under AB 103. It's a statute that he administers. His views on the scope of it are... Yeah, I wasn't suggesting that your view isn't important. I just want... You kept saying the state and the Attorney General. I was trying to figure out who the state was other than the Attorney General. Understood, Your Honor. I also think it's important for the court to take into account the fact that this is a facial challenge. And so, for the United States to prevail on its motion for a preliminary injunction, it has to show that it's likely to succeed on its claim that the statute has essentially no constitutional applications. I don't think the United States can carry that burden here. Since we're talking constitutional, let me say what I'm struggling with with 103. The North Dakota case suggests that we have to consider the broad regulatory context of a statute, as opposed to McCulloch v. Maryland, which seems to suggest almost any interference could be a problem. What I'm seeing here is a, I guess for want of a better word, is there a de minimis exception to the doctrine of intergovernmental immunity? I don't think there's a de minimis exception, but Your Honor is correct that the relevant question under the intergovernmental immunity doctrine is whether when you look at the regulatory structure as a whole, and not a particular statute in isolation, whether the state is treating the federal government or those with whom it deals in a more burdensome way than the state deals with those. So let's take that. The district judge, I believe it was an affidavit from one of the federal officials talking about the burdens that he viewed being imposed on these confinement issues. I think there was a statement, the effect that the state owned facilities had been inspected, but none of the, I think, five facilities that were private contracts had yet been investigated. But even taking at face value what the federal officer said, the district judge found that there was really not very much of an interference. It didn't seem to bother them that much. So what I struggle with here is, under the North Dakota case, do I look at whether, if there's just a little bit of interference, that's probably okay, or do we look at it under McCullough, which says basically any interference at all in this situation, because clearly the federal government has more burden than the state facilities under these contracts. Is that okay, basically? Under North Dakota, is it all right to have a little bit of a burden, or can there be none at all? The question is whether the burden on those who deal with the federal government is commensurate with the burden on those who deal with the state. And here we have a situation where facilities that hold individuals on the authority of state criminal law are subject to regulation of the conditions of confinement. That's in Penal Code section 4000 and the following sections, and are But can there be more requirements of the federally, I guess they're leased from somebody, or there's a contract. Can there be a greater requirement on the federal government than there is on the state facilities? The Intergovernmental Immunity Doctrine doesn't permit an incommensurate burden unless... What is that, incommensurate? What does that mean? A greater burden compared with those who deal with the state, unless the state can justify that burden by significant differences between the classes being regulated. So with respect to apprehension, how does the state regulate the apprehension of people who are not in this circumstance? Of non-immigration detainees? So apprehension and transfer is not an express aspect of the scheme. Okay. So then a greater burden is being placed on the federal government than on local folks, right? Well, no, I'm not saying that. The facilities that hold those under state criminal confinement are subject to regulations concerning their conditions. Right. No, besides the conditions. It seems to me the condition stuff is, as you would say, not incommensurate, or as I would say, commensurate. My question is... She's the Attorney General. And a very good one, so I'm not... My question is, you have under this 103 the ability to look at conditions of apprehension. The Attorney General is given the ability to look at apprehension issues. I don't find that similar ability of anybody other than the state courts look at it with respect to state and local facilities. So if that's an additional thing, why shouldn't that be struck? It shouldn't because, as Your Honor pointed out, there is, of course, greater authority that the state has to handle issues of apprehension and transfer for those in state criminal custody. But it hasn't chosen to do so. It hasn't chosen to give your client, the Attorney General, the ability to go out and make those inspections, nor has it given any other agency, other than the courts, perhaps, the ability to make those determinations. So why should the state oversee the federal government's operations in that area? So under the Intergovernmental Immunity Doctrine, a state is allowed to accommodate its interests in a particular subject matter, even if it can't treat the federal government in an identical fashion. So, for example, under the situation that Your Honor's discussing, the state, of course, does not have the ability to, for example, order a civil immigration detainee to be released, whereas a state court would have that authority. A state is permitted to further its interests in a subject matter in a different way, recognizing the federal government's immunity from certain forms of state control. And I also want to go back to the point I was mentioning a moment ago about the state's justification. So if the court were to conclude that there were disparate burdens that were imposed on immigration facilities, it would need to reach the question whether any differences in the schemes were justified or directly related to differences in the classes of activities or individuals. So just to paraphrase, you are stating that, I'm saying under North Dakota, small differences are okay. Treatment of the state and the federal government by the state of California. There has to be an equivalence in the quantum of burden, but it doesn't mean... What does that mean? That the state, the federal government cannot have additional burdens imposed on it that the state, that those who deal with the state don't, so that... Let's just say hypothetically that the cost of complying with this inspection is 10% more for the federal government than it is for the state to comply with AB 103. Is that legal? So the question is whether overall there's a greater burden, and as I was pointing out... I'm saying 10%. In terms of within the universe of AB 103, say that there's 10% more costs on the federal government than there is on the state. Is that lawful under the North Dakota case? If on balance, the overall regulatory structure required the federal government to carry a greater burden, even a 10% one, yes, that would be a problem. That would be an as-applied challenge. Correct. And unless the state could justify that difference because of differences in the nature of the class of activity being regulated. And Judge Smith, I understand the dilemma in a court attempting to weigh different burdens that might be imposed through a regulatory structure. And two points on that. One, it's the United States' burden to show that it's being treated differently. And two, in North Dakota, the court recognized that the intergovernmental immunity doctrine should be applied functionally, should accommodate both sovereigns' interests, and that this should respect Congress's primary role in deciding the respective roles for state and federal regulation. And so that in a case like this, where the United States hasn't demonstrated on this record that there is an incommensurate burden, it really could be, it really is appropriately a question for Congress. Let me ask you this. One of the amici raised the interesting point that all of the contracts, I think there are five, between the federal government and some of these facilities, have in them clauses that basically say that they will be subject to local and state laws. It almost suggests that there may be a waiver here. Would you comment on that? I don't think it's a formal waiver of immunity, but I think it does confirm that the concession that the United States has made here, which is the state has concurrent regulation over these facilities, which I think it's very important to be, to recognize that these facilities are operated by private companies or local governments. They're not operated by the federal government itself. But it's treated the same for purposes of North Dakota analysis, is it not? In other words, if the federal government contracts with these private parties, it is for purposes of our analysis, the federal government, for purposes of this, right? It's not the federal government, but it's those who deal with the federal government. And we can't burden those who deal with the, the states can't burden those who deal with the federal government disproportionately to those who deal with the state government, correct? Unless there's a justification stemming from the difference in classes, but I think the fact that a number of those, the entities that are dealing with the federal government in this context are county governments and that the state is choosing to apply an inspection scheme to those entities really undermines the suggestion that the government, the federal government... But they don't object to the inspection scheme. What they object to is other aspects of 103. They've said in their brief, to the extent that the attorney general wants to come and inspect the facilities, that's fine. We don't object to that. He does that for state facilities. That's okay with us. It's other aspects of 103 that they're objecting to. I'm not sure that they don't object to that. Well, I guess I'll ask your friend, but his brief sure seems to say that. The board of state community corrections is the entity responsible under state law. Right. So there's a state, there's a different state entity that does it. They have acknowledged that and agree that the state can apply it's a general inspection or health or safety scheme, and AB 103 fits within that. Your time's running down, but I wanted to ask you about 450. I had a couple of questions about SB54 too, so I just hope that Jeff Smith will be generous. So just a quick question about 450. Put aside obstacle preemption for a second. What I wonder is whether or not this is, we're putting more of a burden on the federal scheme here than on a state scheme. So I don't see any requirement that employers report inspections by state OSHA people or all the other folks who might inspect facilities, your tax people, that they report those to the affected employees. Assuming that there isn't one of those, a reporting activity on the sort of purely state activity side, does that create a discrimination problem? There is no discrimination problem here. The discrimination element of the intergovernmental immunity doctrine prohibits states from imposing undue or incommensurate burdens on those who deal with the federal government. An employer in this context is not dealing with the federal government in the relevant sense. The doctrine has been applied in situations where the federal government has entered into a contract with someone or leasing land or a federal employee. Here, the employer is regulated by the expansion of the intergovernmental immunity doctrine and a stretch away from its purposes to apply it in this context where the only relationship between the employer and the federal government is one of a regulated entity and a regulator. You answered my question. I wanted to briefly address the preemption issue as it relates to AB 450, particularly with respect to the United States arguments about that. It is not simply that federal law does not prohibit notices to employees. The federal government affirmatively encourages and it directs those notices. The United States Department of Justice has encouraged as a best practice that employers provide notices to employees. The Immigration and Customs Enforcement Agency has said that employers should provide notice to employees in circumstances like my friend pointed out where there is a discrepancy in paperwork. To give the employee an opportunity to correct that paperwork, California's scheme is fully consistent with that federal scheme. Even though it makes notice mandatory and with penalties attached in a way that federal law doesn't, the U.S. Supreme Court's decision in Chamber of Commerce v. Whiting fully answers the concern the United States has raised in regard to that. States have authority to make mandatory something that the government encourages. Going back to SB 54, how is the Attorney General interpreting the prohibition on transfer assistance? How is this working on the ground? The prohibition on transfer assistance when it involves a qualifying conviction or a judicial warrant prohibits the deployment or use of state resources to facilitate a transfer from state to federal custody. I know what the statute says. I'm asking on the ground. Just give me a real world practical view. So what's happening? When somebody is about to be released, what's the state of the play on the ground? So the prohibition would prohibit, for example, a local jail from escorting a federal officer into the secure area of the jail and physically transferring a person from state to federal custody. It would not, however, preclude a local jail from permitting an immigration officer from being in the public area of the jail. So it's really that facilitation that the statute addresses. So as long as the agent is waiting in the public area, the local jailer, I guess, or whoever is going to release the person from custody just has to open the door and not kind of walk the person up to the agent? I mean, that's what I'm wondering. That's right. The transfer restriction doesn't contemplate any kind of interference or prevention of an immigration officer taking custody of a person once that person is no longer in state custody. So when the person enters the public area of the jail, that person is no longer in state custody and immigration officers can have discretion to enforce federal law in the fashion they see fit. Okay. And so do you think that if it could simply come in and say we're going to come on a daily basis and basically remove from your custody any folks that we believe are removable from the country? I think Congress probably would have the authority to do that, to say that the federal government may remove individuals before state custody concludes. Of course, that is not the judgment that it made in the INA. As to the not sharing the release date, could Congress simply authorize federal agents to subpoena that information from the state if you're not going to provide it in the way that they've requested? I don't think it could require an administrative subpoena in that fashion. Yeah, why not? Because it would reflect the kind of unconstitutional commandeering that the court alluded to earlier, where it would effectively compel state and local officials to participate in enforcing a federal regulation. So anytime the state has information that would be useful to the federal government in administering some federal program and the state just decides, you know what, we don't want to give it, you think the state can resist a subpoena for that investigation? I think the commandeering doctrine entitles the state to decline to participate in enforcing a federal program. There isn't any exception under those circumstances because it's information sharing. The court, unless it's an information sharing requirement that applies equally to state and private parties, like of the kind that the court upheld in Reno versus Condon. There's nothing to be equal to because private parties don't typically have the authority to incarcerate people. And that's precisely the point, which is that the commandeering doctrine protects state sovereign functions from being conscripted into the service of a federal but did not go into the second, third, and fourth winter factors because it decided it based upon the first. Arguendo. If we decided that AB 103 imposes an unconstitutional burden in some respects, should we send that back to the district judge to determine the proper application of the second, third, and fourth winter factors? Or does our court have enough information based on those to make our own determination in that regard? I think the court could conclude that the state has important interests in understanding the conditions that are in local and privately operated detention facilities and that that interest would be irreparably harmed by the courts invalidating during the pendency of litigation AB 103. Are the provisions of AB 103 severable? I think they are, Your Honor. We think all the provisions are valid, and it's the United States' burden to demonstrate that it has no constitutional application on the facial charge. No, but that's not the question I asked. Are they severable? I understand if the court has particular concerns about a particular aspect of it, the court could conclude that the United States is entitled to preliminary relief with respect to that particular provision and leave the remainder of the statute intact. Okay, we're good. Thank you, Your Honor. Thank you. So we have some two minutes. Thank you, Your Honor. Three points I want to make. Two of them are based on the Supreme Court's recent decision in Dawson v. Steger that was the subject of a letter which answers some of the questions on intergovernmental immunity. The court was interpreting a provision, Section 111, but it said that that provision codified the principles of intergovernmental immunity. And there's just two points I want to make about that. The first is on page 4 of the slip opinion, and this goes to the question of how much the burden needs to be. The Supreme Court said, Section 111, which codifies principles of intergovernmental tax immunity, disallows any State tax that discriminates against a Federal officer or employee, not just those that seem to us especially cumbersome. So the Supreme Court rejected the argument that there's some de minimis exception that a court's supposed to assess whether it's a lot more burdensome or a little more burdensome. That's a tax, and that goes right back to McCullough, which says more or less. But we're not really talking about a tax here. What do we deal with in 103, for example? Well, the Supreme Court made clear in that case and others that the principles of McCullough had been incorporated into the doctrine of intergovernmental tax immunity and then had expanded to other forms of intergovernmental immunity. And the cases the State's relying on are tax cases, too. Everyone seems to agree that the principles of intergovernmental immunity, insofar as we're talking about discrimination against the Federal government, are the same in both contexts. And then the other thing the Supreme Court said in that case, which is relevant to the other point about justifying it based on perceived differences, is the Supreme Court said, whether the unlawful — this is on page 8 of the slip opinion — whether the unlawful classification found in the text of a statute might serve as some sort of proxy for a lawful classification hidden behind it is neither here nor there, and then went on to say, if the State wants to draw a distinction based on, in that case, generosity of pension benefits, but we can extrapolate to any neutral criterion, it can enact a law that expressly does that. And so here, what we're dealing with in — in AB 103 and AB 450 are provisions that, on their face, expressly discriminate. I'd love to squeeze in my third point, if I can, but I recognize I may not. Well, I — we appreciate that. You're all very helpful in your arguments. We thank you. We will decide the case as soon as we can. The case disargued is submitted. Thank you. This court for the session is adjourned.
judges: M. Smith, Watford, Hurwitz